**Frank LEAHY, Jr., Plaintiff,**

v.

**UNITED STATES RUBBER COMPANY,**
**Defendant.**

**Civ. A. No. 60–850–C.**

United States District Court
D. Massachusetts.

April 30, 1963.

Thomas E. Cargill, Jr., Boston, Mass., for plaintiff.

Hale & Dorr, Jerome P. Facher, Boston, Mass., for defendant.

CAFFREY, District Judge.

This is an action of tort for negligence which was removed to this Court from the Superior Court for Suffolk County, Commonwealth of Massachusetts, upon the basis of diversity jurisdiction. The case came on for trial to a jury and shortly after the beginning of the trial the parties stipulated in open court to the dismissal of the jury and the continuation of the trial to the Court.

I find and rule as follows:

1. Plaintiff is a resident of Milton, Massachusetts, presently engaged in the used car business in Roslindale, Massachusetts. Defendant is a corporation incorporated under the laws of New Jersey and doing business in Massachusetts and among other things manufactures passenger automobile tires under the name "Gillette."

2. On or about June 13, 1960, plaintiff was employed as Leahy's Esso Service Station, Blue Hill Avenue, Mattapan, as a gas station attendant. On or about that date one Brosnan brought to the plaintiff for mounting two unwrapped Gillette tires, 4-ply nylon, size 670–15, which Brosnan had purchased from Gilchrist's in Quincy on or about June 7, 1960. The tires did not come from the possession of the defendant nor did the plaintiff have any business dealings with Gilchrist's or with the defendant concerning the tires. One of these tires brought to the plaintiff by Brosnan was Serial No. 1595N310 and is the tire here in issue (Exhibit 1). This tire was manufactured by the defendant in April 1960 at its plant in Eau Claire, Wisconsin.

3. Exhibit 1 had been purchased by Brosnan from Gilchrist's or from one Murray L. Feinberg in Quincy but no evidence was offered as to its condition or location prior to its delivery to the plaintiff for mounting or as to what if anything had been done to it by Gilchrist's, Feinberg or Brosnan; or how long and under what circumstances it had been in the possession and control of Gilchrist's or Feinberg. It can be inferred that the tire was sold or delivered to Gilchrist's or to a leased tire department of Gilchrist's and thereafter resold to Brosnan.

4. Plaintiff's mounting equipment was a Coats Iron Tireman, a hand-operated mechanical device on which a tire rim is placed about waist-high and held firmly in order that the old tire can be deflated and demounted and the new tire mounted and inflated. A long iron bar or handle is part of the equipment used

to force the bead of the tire over the rim flange and on to the rim in the mounting process.

5. A modern passenger car tire consists in general of a rubber tread bonded to a number of layers or plies which eventually form the sidewalls and which consist of nylon or rayon cords impregnated with rubber and other material. Two beads which consist of a number of turns of steel wires insulated with rubber compound and wrapped in fabric are affixed to the plies and when moulded and finished the tire is held taut along the circumference of the sidewalls by such beads.

6. In order properly to mount a tire, boh beads as well as the sides of the tire several inches up from the bead must be well lubricated with a fatty soap. The tire must be centered on the rim; that is, one bead must not be down further in the rim well than the other. Air pressure must then be applied slowly to force the bead up on to the rim and to lock it securely in place against the side of the rim.

7. If both beads do not seat against the rim at 40 pounds pressure the proper procedure in mounting is to let air out of the tire, lubricate again if called for, and once more introduce air pressure up to a maximum of 40 pounds. It is not proper mounting procedure to increase the pressure above 40 pounds in order to force the beads to seat.

8. The air compressor at Leahy's Service Station which the plaintiff used to inflate the tire in question was in good operating order and was delivering air pressure at the rate of 150–175 pounds per square inch. There was no gauge on the compressor on the air hose which regulated the amount of air delivered or which indicated the pressure in the tire at any given moment.

9. While plaintiff was mounting the Gillette tires brought in by Brosnan, including Exhibit 1, one Martin McDonald, one of his friends, was present in the same room and was working at a bench about 8–10 feet away. While plaintiff was mounting the Gillette tires brought in by Brosnan, including Exhibit 1, he was also responsible for tending the gasoline pumps and he serviced at least one gas customer during that time.

10. During the inflation of Exhibit 1, plaintiff heard a rush of air like a jet engine and the tire and rim left the mounting stand with terrific force, hit plaintiff's chest, broke his wrist, and traveled approximately 15–20 feet where it broke a fluorescent light fixture and hit the ceiling.

11. Exhibit 1 when examined manually showed a broken bead on one side of the tire. Such broken bead was not obvious visually but could be easily and quickly located in a minute or less by manual manipulation of the bead. No marks on the exterior of the tire were present to indicate the bead had been broken by any external force, nor were there any marks on the inside of the tire-wall indicating an external physical force against the inside of the tire. X-rays of the bead showed a tensile or tension break in the bead wires at or about the point where one set of the bead wires began its coil (the bead consisting of four separate wires each wound four times). At that point where such coil began, the x-rays showed a clean-cut wire end which began the coil (and was not part of the break) which wire end had been cut or sheared. In contrast to this clean cut end the x-ray also showed the fuzzy or rounded ends of the broken bead wires which had been broken by tension. These ends showed the typical configuration of wires with a tensile break.

12. Upon examination after the accident Exhibit 1 showed a crescent-shaped scuff above the bead which paralleled in quartermoon shape about one-half of the circumference of the bead. This crescent scuff was caused by the tire's being forced upward and outward against the rim flange as it left the rim as a result of excess pressure applied to an off-centered bead. Such crescent-shaped scuff is typically found in such circumstances and tests conducted by the defendant's expert have found that such

a scuff usually occurs with off-centered mismounting and excess pressure.

13. The plaintiff offered no evidence as to the defendant's manufacturing processes or as to the defendant's inspection procedures. These processes and procedures showing the defendant's due care were described by the defendant's expert and were not in any way controverted. The plaintiff failed to present any evidence indicating a failure of the defendant to inspect or indicating that Exhibit 1 had been improperly inspected.

14. The vulcanization process used by United States Rubber Company is the so-called bagomatic process using a mould in which the tire is completely enclosed. Nothing in the vulcanizing process could exert sufficient force to cause a tensile break as found in the bead wire of Exhibit 1 and the bead wire of Exhibit 1 was not broken in the vulcanization process.

15. The plaintiff's expert did not offer any evidence as to when, where or how the tire bead was broken except a general opinion that it had been broken at the factory. This opinion was supported only by the conclusion that the tire could not have been broken in mounting. While plaintiff's expert contended that the bead was broken by the vulcanization process he was not familiar with the vulcanization process used by United States Rubber Company and his testimony described a process not used by United States Rubber Company.

16. In addition to defendant's various inspections of its materials and its manufactured product, Exhibit 1 was subjected to a defendant's process known as "post inflation" by which each tire is placed by hand on a rim on which such a tire would ordinarily be mounted and is thereafter inflated to 50 pounds pressure. A circular mark on Exhibit 1 indicated that it had been subjected to post inflation.

17. The wire used in the bead of Exhibit 1 was bronze-plated steel wire of 270,000 tensile strength, a diameter of .037 inches and a breaking point of 285 pounds per strand. Each bead bundle contained 16 strands of such wire.

18. In inflating a tube in the mounting process extreme care must be taken in applying air pressure since excess pressure builds up in a matter of seconds from a compressor delivering 150–175 pounds per square inch, such as was used here to inflate Exhibit 1.

19. In mounting Exhibit 1 the plaintiff applied air pressure to the valve on at least four or five occasions and was in the process of either applying air or having just applied air when the accident occurred.

20. The plaintiff was standing directly over the tire with the air hose in his right hand and a tire gauge in his left hand. No gauge measured the pressure as it was being delivered from the compressor into the tire and there was no regulator or other mechanism which would shut off the pressure after it reached a given quantity.

21. The plaintiff considered the mounting of Exhibit 1 to be a routine part of a routine day. The plaintiff's memory of the mounting of Exhibit 1 was conditioned and colored by his past experience and association as to what proper mounting procedure should have been rather than by what he actually did with respect to mounting Exhibit 1.

22. The plaintiff failed properly to lubricate Exhibit 1 before mounting in that he did not lubricate the sides of the tire.

23. The plaintiff introduced pressure in excess of 40 pounds and probably in the neighborhood of 70 pounds or more into Exhibit 1.

24. The plaintiff did not have Exhibit 1 properly centered on the rim.

25. The plaintiff's injuries were caused by a mismounting of Exhibit 1 which broke the bead and caused the accident and was not caused by a pre-broken bead.

26. I do not accept the testimony proffered by plaintiff's expert on the question of bead breakage or on the subject of modern methods of tire manufac-

ture. The defendant's expert, Mr. William Briscoe, was a qualified expert on the manufacture and mounting of tires, on the testing of tires with sound and broken beads, on the cause of bead breakage and on the reading and interpretation of x-rays with respect to broken beads.

27. I find Mr. Briscoe to be a highly qualified expert in his field and likewise a competent and truthful witness and on the basis of his testimony, which I accept, I adopt his opinion that even assuming a pre-broken bead, if only 18 pounds pressure were introduced into the tire, the bead would seat on the rim and no explosion or accident would be caused. Such a pre-broken bead, if it existed, which the defendant denies, would therefore not be the natural and probable cause of the accident but such accident, even under this assumption, could only have been caused by introduction of excess pressure which was the plaintiff's own act.

28. I also adopt Mr. Briscoe's opinion that even assuming a pre-broken bead and even assuming the bead left the rim, if only 18 pounds pressure were introduced into the tire, the tire and rim could not move upward from the mounting stand with sufficient force and velocity to break the plaintiff's wrist, travel 15–20 feet, break a light and hit the ceiling. Such a pre-broken bead, if it existed, which defendant denies, would therefore not be the natural and probable cause of the accident but such accident, even under this assumption, could only have been caused by introduction of excess pressure which was the plaintiff's own act.

29. The bead in Exhibit 1 was not broken at the defendant's factory or by the defendant or by any person for whose conduct the defendant was responsible.

30. Exhibit 1 was broken in the mounting process by the actions of plaintiff for which defendant was not responsible.

I find and rule that plaintiff has failed to sustain his burden of proving any negligent act on the part of the defendant, its employees, servants, or any other person for whose conduct the defendant is legally responsible, and I find and rule that defendant has established that plaintiff was contributorily negligent and that the injury to plaintiff was a proximate result of his own negligence. Cf. Tralli v. Triple X Stores, Inc., 19 Conn.Sup. 293, 112 A.2d 507, 512 (1954).

Judgment for defendant.